CLOSED

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AMBULATORY ANESTHESIA OF NEW JERSEY, P.A., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-4725 (JAP) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHAEL O. LEAVITT, in his official capacity as SECRETARY OF THE UNITED STATES DEPT. OF HEALTH AND HUMAN SERVICES, | : | |
| | : | |
| Defendant. | : | |

APPEARANCES:

John Zen Jackson
Kalison, McBride, Jackson & Murphy, P.A.
25 Independence Boulevard
Warren, NJ 07059
    *Attorney for Plaintiff Ambulatory Anesthesia of New Jersey, P.A.*

Christopher J. Christie
United States Attorney
Anthony J. LaBruna
Peter G. O'Malley
Assistant United States Attorneys
970 Broad Street, Suite 700
Newark, NJ 07102
    *Attorneys for Defendant Michael O. Leavitt, Secretary of the Dept. of Health and Human Services*

PISANO, District Judge.

Currently before the Court is an action for judicial review, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1395ff(b)(1)(A), of a final administrative decision of the Secretary of the Department of Health and Human Services ("Secretary") regarding Medicare overpayments received by Ambulatory Anesthesia of New Jersey ("AANJ"). Having reviewed the administrative record and the parties' submissions, the Court finds that there is substantial evidence to support the factual findings of the Administrative Law Judge ("ALJ") and finds no error with respect to the ALJ's legal conclusions. Accordingly, the Court affirms the Secretary's final decision.

## I.  BACKGROUND

This action involves claims for anesthesia services under Part B of the Medicare program, a voluntary supplemental insurance program covering certain outpatient services, including physician services. *See* 42 U.S.C. §§ 1395j, 1395w-4. At all times relevant to this matter, AANJ was the business organization for Dr. Kenneth Zahl ("Dr. Zahl")'s pain management and anesthesiology practice. (Administrative Record ("AR") 00265 at ¶ 2). As part of its practice, AANJ provided anesthesia for patients undergoing cataract surgery in the Ridgedale Surgery Center ("Ridgedale"), an ambulatory surgery center in Cedar Knolls, New Jersey. (*Id.* at ¶¶ 2, 6). Ridgedale's surgery facilities consisted of an operating room and an adjacent preparation/recovery area. (*Id.* at ¶¶ 5, 13). All anesthesia services were performed either by Dr. Zahl or another of AANJ's physician employees. (*Id.* at ¶¶ 3, 19).

The procedures AANJ performed on patients undergoing cataract surgery mainly consisted of preoperative evaluation and administration of a regional nerve block of the orbital

2

area necessary for the cataract surgery.  (*Id.* at ¶ 19).  An ophthalmic surgeon performed the surgery.  (*Id.*).  After sedating the patient, the AANJ anesthesiologist who was performing the procedure administered the block by injecting medication to anesthetize the area around the eye. The anesthesiologist would then observe the patient to confirm the effectiveness of the anesthetic block and monitor the patient's vital signs during the course of surgery, being available to provide additional pain relief or even administer a general anesthetic, if necessary.  (*Id.* at  ¶¶ 9-11).  As Dr. Zahl explained in an affidavit, AANJ anesthesiologists frequently attended to two patients—one undergoing a procedure in the operating room and another being prepared in the pre-op area—within the same time period:

> To facilitate more rapid turnover [of patients], I would attend to the first patient in the Pre-Op Area and in the Operating Room as necessary.  Typically, I would be literally at the patient's bedside in the Operating Room for five to fifteen minutes. I was, however, immediately available to the patient throughout the time he was in the Operating Room, or Post-Op Area, and no other anesthesia professional was available.  Before that first patient physically departed the Operating Room, I would also provide the initial sedative and nerve block administrations to the next patient, who was prepared and waited in the Pre-Op Area.  While that next patient's anesthesia took effect, I would continue to be available as necessary to the first patient in the Operating Room through the point of release to the nurses in the Post-Op area.  (*Id.* at  ¶¶ 16).

Despite Medicare regulations requiring the use of Anesthesia Codes and time units for the purposes of billing, beginning in October 1993, Dr. Zahl decided to bill using CPT 6000 Nerve Block Procedure Codes.[1]  According to Dr. Zahl, AANJ implemented this policy only after discussing its propriety with Xact Medicare Services ("Xact"), the Medicare carrier then

---

[1] Medicare uses the CPT code system to describe different medical procedures.

responsible for processing AANJ's bills,[2] a representative from the Health Care Financing Administration ("HCFA"),[3] and the principal of William E. Rose, Jr. & Associates, a physician practice consulting firm.  According to Dr. Zahl, both the representative from the HCFA and Mr. William Rose informed him that either the Nerve Block Procedure Codes or the Anesthesia Codes could be used for billing given AANJ's practice.

Nevertheless, in January 1995, Xact undertook an audit of AANJ and concluded that AANJ was improperly billing its anesthesia services under the Nerve Block Procedure Codes. (AR 00092, 00736, 00747).  Xact informed AANJ that the anesthesia services had to be billed using the Anesthesia Codes.  (AR 00092).  Also as a result of the audit, Xact determined that AANJ was the only provider reporting its services under Nerve Block Codes as opposed to Anesthesia Codes.  (AR 00736, 747).  Xact concluded that AANJ, having used the wrong codes, received an overpayment of $2294.49.  (AR 00738).  Consequently, it sent a letter to AANJ requesting a refund and furnished AANJ with educational information reference material regarding anesthesia guidelines and proper billing thereunder.  (*Id.*).

In August 1996, Xact completed a follow-up review of the services billed by AANJ from July 1995 to June 1996 and determined that AANJ had decreased the number of services being billed with Nerve Block Codes and was billing with the appropriate Anesthesia Codes.  (AR 00728-29).  Due to the positive results of the re-review, Xact concluded that no further action

---

[2] The Medicare statute and implementing regulations authorize the Secretary to contract with private insurance companies, known as "carriers," to administer the Part B Medicare program.  *See* 42 U.S.C. § 1395u; 42 C.F.R. § 421.200 *et seq.*

[3] In July 2001, the HCFA became the Centers for Medicare and Medicaid Services ("CMS").  Because the events at issue occurred prior to the change, the Court will use the term HCFA in this Opinion.

was necessary.  (AR 00729).  On October 5, 1998, however, after considering certain

"educational material" that was furnished to the provider community, Xact imposed a suspension

of Medicare payments to AANJ and Dr. Zahl for the fiscal years 1995 through 1998 due to Dr.

Zahl's submission of bills for overlapping anesthesia times.  (AR 00762, 00770).  In response to

Dr. Zahl's objection to the suspension, Xact advised counsel for Dr. Zahl that

> Xact has completed a review of your client's medical charts and determined that
> he was inappropriately reporting his anesthesia time and use of the AA modifier
> (anesthesia services personally performed by anesthesiologist) for procedure
> codes 00140-00145.  According to the November 1993 Medicare Report article,
> page 21 "anesthesia time involves the continuous actual presence of the
> anesthesiologist."  Our review found instances where your client billed Medicare
> for anesthesia time for two procedures performed concurrently.  The overlapping
> time of these two anesthesia procedures indicates that your client could not have
> been personally continuously and actually present during the overlapping times of
> the concurrent anesthesia procedures.  Therefore, we have identified an apparent
> overpayment for the overlapping anesthesia time billed to Medicare for those
> procedures and are reviewing the circumstances creating that situation.  (AR
> 00780).

In a June 2, 1999 letter, HCFA advised AANJ that it would not stop the payment suspension and

referred AANJ to Xact's policy advising the use of Anesthesia Codes:  "In November 1993, Xact

published and distributed its local policy for Lens Surgery advising providers to use

anesthesiology codes and not the nerve block codes.  Therefore, Xact's policy is the appropriate

policy that Dr. Zahl should have been following."  (AR 00757, 00758).

Empire Medicare Services ("Empire"), who succeeded Xact, hired Dr. Kermit R. Tantum,

M.D. to review AANJ charts with anesthesia billing codes.  Dr. Tantum reviewed 104 records of

beneficiaries who underwent eye surgery at Ridgedale between the dates of October 31, 1995 and

November 17, 1997 and the operating room schedules for relevant dates of services.  (AR

00374).  In a report issued on June 17, 1999, Dr. Tantum found that, though AANJ provided high

quality service, AANJ incorrectly reported overlapping times:

> The problem central to these cases is the use of the AA modifier (by me
> personally) and then reporting overlapping times, *i.e.*, personally caring for more
> than one patient during the same time period.  It is conceivable that a physician
> could personally care for more than one patient at a time.  The many duties of the
> anesthesiologist (pre-operative evaluation, operating room care and monitoring,
> recovery room duties) combined with the pressures of rapid operating room
> turnover times make this difficult to avoid.  This is not however the common
> understanding of "Personally Performed" *i.e.*, it means one patient at a time.  (AR
> 00748-49).[4]

Ultimately, Dr. Tantum concluded:  "The services provided to these 104 Medicare patients were

personally performed and correctly coded.  The reported times were incorrect and over reported

by 1493 minutes (14 minute average per case)."  (AR 00749).[5]

   In a November 22, 1999 letter, Empire notified AANJ of the results of Dr. Tantum's

review and of Empire's determination that AANJ had been overpaid in the amount of $1372.39

due to improper billing for concurrent/overlapping anesthesia services.  (AR 00376).  Empire

informed Dr. Zahl that his billing practice "resulted in an inflated number of anesthesia time

units being reported on the claims as having been personally performed by you" and that "[s]uch

a billing practice is clearly improper because it suggests that you were furnishing two services at

the same time."  (AR 00374).  Additionally, Empire found AANJ ineligible for a waiver of the

overpayment under Section 1879 of the Medicare statute based on the information available to

him, including the law, regulations, Medicare reports, and information from peers in the medical

---

   [4] Use of the personal performance modifier, or AA modifier, entitled an anesthesiologist
to the highest rate of pay.

   [5] Dr. Zahl claims that any bills for overlapping times resulted from the work of an Xact
auditor whose reconstruction of certain audited claims reflected overlaps in time between
patients.  According to Dr. Zahl, the auditor acknowledged the overlaps and informed him that
this was the only appropriate way to bill for his services.

community.  (AR 00377).  Empire further found that the "without fault" provisions of Section 1870 of the statute did not apply to AANJ because it failed to comply with the relevant laws, regulations, and Medicare reports.  Thus, AANJ was liable for repayment of the excess funds it received.  Finally, on September 7, 2000, Empire issued a revised notice increasing the amount of the overpayment to $1969.04 based on its recalculation of the overpayment.  (AR 00358, 00362).

Pursuant to an AANJ request, Fair Hearing Officer ("FHO") Debra Jo Eckert ("Eckert") held a Medicare Fair Hearing on May 22, 2001.  In a decision announced on June 4, 2001, Eckert upheld the overpayment and concluded that AANJ was not entitled to the limitation of liability and waiver of repayment under either Section 1879 (42 U.S.C. § 13955pp) or Section 1870 (42 U.S.C. § 1395ff) of the Medicare statute. (AR 00395-462).  Eckert found that AANJ was "not without fault," but specifically declined to make any findings on whether AANJ committed Medicare fraud.  (AR 00402).

AANJ requested an appeal of that decision before an ALJ of the Office of Hearings and Appeals of the Social Security Act.  ALJ Dennis O'Leary held the appeal hearing on December 14, 2001, and issued an opinion on December 27, 2001.  In relevant part, the ALJ found that "[t]he regulations do not permit the billing of overlapping/concurrent anesthesia times" and "[t]he statute and regulations do not provide for the waiver of appellant's overpayment," meaning AANJ was not without fault.  (AR 00153).  Further, the ALJ concluded that AANJ received overpayments totaling $1969.04 as a result of incorrect billing for overlapping/concurrent anesthesia times.  (*Id.*)  On July 27, 2004, the Medicare Appeals Council denied AANJ's request for further review.  (AR 00009-10).  Soon thereafter, on September 24, 2004, AANJ filed a

7

complaint before this Court, seeking review of the ALJ's decision.[6]

Also relevant to this action are state administrative proceedings which the Attorney General of the State of New Jersey (the "Attorney General") commenced in August 1999 when he filed an eight-count complaint against Dr. Zahl before the State Board of Medical Examiners of the New Jersey Department of Law and Public Safety, Division of Consumer Affairs (the "Board of Medical Examiners").  The Attorney General sought, *inter alia*, "suspension or revocation of Dr. Zahl's license to practice medicine and surgery in New Jersey for having engaged in a variety of fraudulent, deceptive and misleading practices."  (AR 00192).  The Board of Medical Examiners declined to grant the Attorney General's request for a summary decision and referred the charges to the Office of Administrative Law ("OAL") for a plenary hearing.  Prior to any decision of the OAL, Dr. Zahl brought action in New Jersey Federal District Court seeking to enjoin the state administrative proceeding on the grounds that the federal Medicare regulatory scheme preempted any such state action.  The court dismissed the complaint, however, reasoning that the abstention doctrine precluded the court from interfering with the state proceeding.  (AR 00200-205).  The Third Circuit affirmed in *Zahl v. Harper*, 282 F.3d 204 (3d Cir. 2002).

On August 27, 2001, the OAL concluded that Dr. Zahl's receipt of Medicare payments for overlapping anesthesia times "constitute[d] the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense in violation of N.J.S.A. 45:1-21(b) and professional misconduct in violation of N.J.S.A. 45:1-21(e)."  (AR 00177).  In reaching that conclusion, the OAL relied heavily on FHO Eckert's findings that Zahl improperly billed his

---

[6] The ALJ's opinion represents the final decision of the Secretary.

8

Medicare carrier and that he was "not without fault" in doing so.

Plaintiff now appeals the Secretary's decision, arguing that the Secretary erred in concluding that (1) the relevant Medicare regulations prohibited the use of the personal performance or AA modifier unless the physician administering the anesthesia was present in the operating room, without interruption, for the duration of the procedure and (2) that AANJ was not without fault with respect to the receipt of payment for overlapping anesthesia times. Plaintiff urges the Court to reverse the decision of the Secretary, in part, to rectify what Plaintiff characterizes as "unintended consequences," namely that the OAL improperly equated the Secretary's decision with a conclusion that Dr. Zahl committed fraud.

## II.  Discussion

### A.  Standard of Review

The Medicare statute provides that the "findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive" in any judicial review of the Secretary's final decision.  42 U.S.C. § 405(g); 42 U.S.C. § 1395ff(b)(1)(A).  Thus, the standard under which the district court reviews an ALJ decision is whether there is substantial evidence in the record to support the ALJ's decision.  *See id.*; *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). "[M]ore than a mere scintilla," substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The inquiry is not whether the reviewing court would have made the same determination, but rather, whether the ALJ's conclusion was reasonable.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Substantial evidence, therefore, may be slightly less than a preponderance.  *See Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

As a result of the deferential substantial evidence standard of review, "district courts have no fact-finding role." *Grant v. Shalala*, 989 F.2d 1332, 1337 (3d Cir. 1993) (quotation omitted). Further, when reviewing an agency interpretation of a regulation, the court "is not to impose its own interpretation of . . . the regulation, but instead to defer to [an agency]'s position as long as it is reasonable." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986) (quotation omitted). District courts, however, apply a *de novo* standard of review to an ALJ's conclusions of law. *See Binjon v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997) ("Conclusions of law are not entitled to deference, however, so if the [Secretary] commits an error of law, reversal is required without regard to the volume of evidence in support of factual findings.").

### B.  Analysis

AANJ challenges the ALJ's findings on two grounds. First, AANJ asserts that the ALJ erred in concluding that the "continuous actual presence" requirement of 42 C.F.R. § 414.64(a)(2) prohibits overlapping time charges when an anesthesiologist works alone. Second, AANJ claims that, even if the ALJ correctly interpreted the regulation, the overpayment should have been waived because there is no evidence that AANJ knew or should have known that its billing practice violated the Medicare statute and implementing regulations. As explained below, the Court finds both arguments unpersuasive and affirms the ALJ's decision.

### 1.  Continuous Actual Presence

Relying on his own interpretation of the plain language of § 414.64(a)(2), the Medicare Carrier's Manual ("MCM"), and *United States v. Erickson*, 75 F.3d 470 (9th Cir. 1996), the ALJ concluded that "the regulations do not permit the billing of overlapping/concurrent anesthesia times." (AR 00150). Having reviewed the ALJ's analysis and decision, the Court finds that

10

there is substantial evidence supporting the ALJ's findings of fact.  Moreover, to the extent that

the ALJ's findings regarding the billing of overlapping/concurrent anesthesia times present

conclusions of law, the Court finds no error.

The plain language of the applicable regulation supports the ALJ's conclusion that the

billing of overlapping/concurrent anesthesia times was impermissible.  Indeed, in instances

where an anesthesiologist performed a procedure without any assistance, § 414.64(a)(2)

permitted billing under the personal performance modifier only when the procedure involved

> the continuous actual presence of the physician (or of the medically directed
> qualified anesthetist or resident) and starts when he or she begins to prepare the
> patient for anesthesia care and ends when the anesthesiologist (or medically
> directed CRNA) is no longer in personal attendance, that is, when the patient may
> be safely placed under post-operative care.

42 C.F.R. § 414.64(a)(2) (1992) & (1996).  Though the regulation does not define "continuous

actual presence" or "personal attendance," the ALJ determined that the plain meaning of that

language indicates that billing should reflect a one patient at-a-time approach.  Further, the plain

meaning necessarily precludes the billing of overlapping/concurrent time for the treatment of two

patients:  a physician could not be continuously and actually present for an entire procedure if

that physician left the operating room to attend to another patient.  The ALJ's interpretation is

also supported by various HFCA memoranda, *see Minnesota Ass'n of Nurse Anesthetists v.*

*Allina Health System Corp et al.*, 276 F.3d 1032, 1054-56 (8th Cir. 2002), publications from

local carriers, *see* AR 00794, 796-98, 800-01), and a regulatory history which indicates that

"continuous actual presence" means uninterrupted attendance to one patient at-a-time, s*ee* Fed.

Reg. 33878, 33887 (July 31, 1992); Fed. Reg. 59502, 59510 (Nov. 25, 1991).

Additionally, the MCM, which is afforded deference as a valid interpretation of relevant

statutory and regulatory provisions, supports the ALJ's conclusion.  Section 15018 states:

> Anesthesia time means the time during which an anesthesia practitioner is present with the patient.  It starts when the anesthesia practitioner begins to prepare the patient for anesthesia services in the operating room or an equivalent area and ends when the anesthesia practitioner is no longer furnishing anesthesia services to the patient, that is, when the patient may be placed safely under postoperative care.  Anesthesia time is a continuous time period from the start of anesthesia to the end of an anesthesia service.

(*See also* MCM §§ 8310-8313).  This section of the MCM, upon which the ALJ expressly relied, creates a requirement of continuous, *i.e.*, uninterrupted, service to one patient from the beginning of the procedure until the end.  As such, it is consistent with the ALJ's conclusion that § 414.64(a)(2) does not permit anesthesiologists to bill for overlapping time for the treatment of two patients.

In *United States v. Erickson*, 75 F.3d 470 (9th Cir. 1996), which involved allegations of over-billing for the services of certified registered nurse anesthestists ("CRNA"), the court addressed the issue of "whether the phrase continuous actual presence can be held to refer clearly to a continually present provider."  75 F.3d at 475.  As the ALJ noted, the *Erickson* Court found that the regulation, which also applies to anesthesiologists, "clearly limits CRNA reimbursement to periods when the CRNA is actually with and looking after the patient.  The regulation requires personal attendance that is said to cease when the patient is placed under the care of another."  *Id.* Relying on that language, the ALJ concluded that "the regulation clearly limits reimbursement to periods when the anesthesia practitioner is actually with and looking after the patient."  (AR 00045).

AANJ argues that *Erickson* does not represent a judicial finding that § 414.64(a)(2) prohibits the "billing of small amounts of overlapping time where the anesthesiologist was

continuously and actually present in the operating suite" and personally provided the anesthesia

services. (Pltf's Br. at 27-28.) That argument, however, assumes that a physician who leaves the

operating room to attend to a patient in a pre-op area satisfies "continuous actual presence" as to

the patient still in the operating room. The ALJ found that "continuous actual presence" does not

allow an anesthesiologist to bill as though he is providing services to both patients in that

scenario and *Erickson* supports that interpretation. Despite the distinctions that may be drawn

between *Erickson* and the present case, the Ninth Circuit unequivocally determined that a service

provider must be "actually with and looking after the patient" in order to bill for anesthesia

services using the personal performance or AA modifier.[7]  *See Erickson*, 75 F.3d 475.

Thus, there are multiple sources that support the ALJ's conclusion that an

anesthesiologist's departure from the operating room to attend to another patient, albeit in close

proximity to the operating room, does not qualify as "continuous actual presence" under

§ 414.64(a)(2). As a result, the Court agrees with the ALJ that AANJ's method for

billing—using the personal performance modifier despite a failure to adhere to the continuous

actual presence requirement—violated § 414.64(a)(2).

### 2. Waiver of Overpayment

AANJ argues that the ALJ's finding that it was not without fault with respect to receipt of

the Medicare overpayments is not supported by substantial evidence. Specifically, AANJ

---

[7] The Court rejects Plaintiff's argument that the requirement of uninterrupted attendance to one patient at a time only applies to scenarios in which both an anesthesiologist and a CRNA work on the same case. This argument rests on the faulty premise that the HFCA created a standard requiring the uninterrupted attendance of two providers—a CRNA and an anesthesiologist—when both are working on the same case, but imposing no such requirement on an anesthesiologist who is working alone.

13

contends that the ALJ failed to apply the liability limitation provisions of Section 1879 of the Medicare statute, codified at 42 U.S.C. § 1395pp.  The not without fault issue has taken on particular importance, according to AANJ, because the Board of Medical Examiners and the OAL apparently seized upon this finding, equating it with a determination that Dr. Zahl committed fraud.  AANJ urges the Court to correct what it describes as the "unintended" and "grossly unjust" consequences arising out of the ALJ's erroneous finding.

Citing § 1879(a)(2)'s knowledge requirement, AANJ argues that it is without fault because Dr. Zahl "did not know, and could not reasonably have been expected to know" that his billing practices were improper under the Medicare statutory and regulatory schemes.  Dr. Zahl's knowledge is irrelevant here, however, because § 1879(a) only applies to overpayments for medically unnecessary procedures and there was no finding that the services AANJ provided, and for which it received payment, were not medically necessary.  Therefore, the Court finds that Section 1879 is inapplicable to the instant case and provides no basis upon which to find that AANJ's receipt of overpayments was without fault.[8]

Further, as the ALJ found—and AANJ now concedes—, Section 1870(c) of the Medicare Act, codified at 42 U.S.C. § 1395gg, does not permit waiver of overpayments or a finding that the recipient of the overpayment is without fault.  (AR 00046-47).  As AANJ points out, however, Section 7103 of the MCM does permit a limitation of liability for overpayments where the service provider is found to be without fault:

---

[8] Given the inapplicability of Section 1879, the Court does not fault the ALJ for a lack of analysis and discussion of this provision in his written decision.  The Court notes that the FHO's decision discusses the provision, pointing out that "in order to invoke [Section 1879], the disputed services must have been determined to [be] medically unnecessary.  That was not [a] finding in this case . . . ."  (AR 00401).

14

> A physician is liable for overpayments he received unless he is without fault. . . .
> Consider a physician without fault if he exercised reasonable care in billing
> for and accepting the payment; *i.e.*; he made full disclosure of all material facts, and
> on the basis of the information available to him, including, but not limited to, the
> Medicare regulations, he had a reasonable basis for assuming that payment was
> correct or, if the physician had reason to question the payment, he promptly
> brought that question to your attention.

(AR 00532). The FHO applied Section 7103 to the instant case and found that AANJ was liable

for the overpayment. Underlying this conclusion was the FHO's finding that "[AANJ] and Dr.

Zahl had been previously notified in numerous Medicare publications and correspondences with

Xact Medicare Services and Empire Medicare Services of the definition of 'personally

performed' and how to properly bill for blocks of time, and the use of anesthesia codes rather

than nerve block codes for the subject services." Though the ALJ neglected to apply Section

7103 of the MCM, the Court agrees with the FHO's findings.[9] Accordingly, the Court finds that

there is substantial evidence to support of the ALJ's finding that AANJ is not entitled to a waiver

of overpayment.

The Court takes no position on the medical license revocation matter prosecuted by the

Attorney General of New Jersey. Furthermore, the Court has not taken into account the

substance of that matter when reviewing the ALJ's findings with respect to the issue of waiver.

Though neither the FHO nor the ALJ made a finding that AANJ or Dr. Zahl committed Medicare

fraud, that does not entitle AANJ to a waiver of overpayment. Moreover, the Court may not

reverse the Secretary's decision merely because, as AANJ alleges, that decision has been

misconstrued in a state administrative proceeding. This Court has authority only to review the

---

[9] The Court, although satisfied that substantial evidence supports the ALJ's findings as to
waiver, cautions the ALJ that he has a duty to provide a full explanation of his reasoning in order
to ensure meaningful court review. *See Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978).

Secretary's decision and determine whether the ALJ's findings are supported by substantial evidence and whether the ALJ has reached correct conclusions of law.

## IV.  CONCLUSION

After carefully examining the record, the Court is satisfied that there is substantial evidence to support the ALJ's findings.  Further, the Court finds no cause to disturb the ALJ's conclusions of law.  Accordingly, for the reasons expressed above, Plaintiff's appeal is denied.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

DATED:  February 27, 2007

16